USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 6/10/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E.P, *individually and on behalf of*, B.G.,

Plaintiff,

-v-

NEW YORK CITY DEP'T OF EDUC.,

Defendant.

No. 15-CV-0606 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff E.P., (the "Parent") individually and on behalf of her minor child B.G. (the "Student"), brings this action against Defendant the New York City Department of Education (the "DOE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. After concluding that the DOE's proposed education plan and school placement would not provide her son, a child with autism, with a free appropriate public education ("FAPE"), E.P. placed him in the Rebecca School, a private school for children with disabilities, for the 2012–2013 academic year. On August 1, 2013, she filed a due process complaint seeking tuition reimbursement. On June 2, 2014, an Impartial Hearing Officer ("IHO") issued a decision granting E.P.'s request for reimbursement. On September 30, 2014, a State Review Officer ("SRO") reversed the IHO's decision and denied reimbursement. E.P. brought this action on January 28, 2015. Both parties now move for summary judgment. For the following reasons, the DOE's motion for summary judgment is granted, and E.P.'s motion for summary judgment is denied.

## STATUTORY FRAMEWORK

"The IDEA requires 'a state receiving federal funds under the IDEA to provide disabled children with a FAPE.'" *L.O. v. New York City Dep't of Educ.*, --- F.3d ----, 2016 WL 2942301,

at *1 (2d Cir. May 20, 2016) (alterations omitted) (quoting *R.E. v. New York City Dep't of Educ.*, 694. F.3d 167, 174–75 (2d Cir. 2012)). "In order to ensure that disabled children receive a free appropriate public education, school districts must create individual education programs ("IEPs") for such children." *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 72 (2d Cir. 2014). "The IEP is 'a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *R.E.*, 694 F.3d at 175 (quoting *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006)).

The State of New York has made local Committees on Special Education ("CSEs") responsible for developing IEPs. N.Y. Educ. Law § 4402(1)(b)(1). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial behavior and needs." *Gagliardo v. Arlington Central Sch. Dist.*, 489 F.3d 105, 107–08 (2d Cir. 2007) (citing N.Y. Comp. Codes R. & Regs. Tit. 8 § 200.1(ww)(3)(i) (hereinafter "NYCRR")). The CSE must also "ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." 20 U.S.C. § 1414(e); *see also* 34 C.F.R. § 300.501(c)(1).

"If a state fails in its obligation to provide a free appropriate public education to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006). "The Supreme Court has established the three-pronged *Burlington/Carter* Test to determine eligibility for reimbursement, which looks to (1) whether the

school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F.*, 746 F.3d at 73 (internal citations omitted). "Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing." *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) (quoting *R.E.*, 694 F.3d at 184). "If the board fails to carry [its burden of establishing the validity of the IEP], the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *Id.*

"In determining whether an IEP complies with the IDEA, courts make a two-part inquiry, that is, first, procedural, and second, substantive." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013) (quoting *R.E.*, 694 F.3d at 189–90). For procedural violations, courts "examine[ ] the procedural adequacy of the IEP, asking 'whether the state has complied with the procedures set forth in the IDEA.'" *L.O.*, 2016 WL 2942301, at *7 (quoting *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160 (2d Cir. 2014)) (alteration in *L.O.*). "Under this framework, procedural violations will entitle parents to relief only if they impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to the parents' child, or caused a deprivation of educational benefits." *Id.* (internal citations and alterations omitted). "That is, parents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." *Id.* (quoting *M.W.*, 725 F.3d at 139). "[A] school district fulfills its substantive obligation under IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir.

2009) (quotations omitted); *see also M.O.*, 793 F.3d at 239; *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998). In other words, school districts must provide students with a program that provides a "basic floor of opportunity." *T.K. v. New York City Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016).

If a parent believes that an IEP does not comply with the IDEA, the parent may file a due process complaint with the appropriate state agency. 20 U.S.C. § 1415(b)(6). A parent may then challenge the IEP in an "impartial due process hearing," *Id.* § 1415(f), before an IHO appointed by the local board of education. *See* N.Y. Educ. Law § 4404(1). Either party may subsequently challenge the IHO's decision to an SRO. *See Id.* § 4404(2); *see also* 20 U.S.C. § 1415(i)(2)(A). Finally, the SRO's decision may be challenged in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

## FACTUAL BACKGROUND

The following facts are taken from the parties' submissions and the administrative record. Unless otherwise noted, they are undisputed.

### I. The Student's Background

B.G. is classified as a student with autism and was thirteen years old at the beginning of the 2012–2013 school year. Ex. 8 at 1. He has an IQ composite score on the lower end of the borderline range, and a verbal IQ within the upper end of the mildly delayed range. *Id.* According to his psychological evaluation, he meets the criteria for mental retardation and has delays in cognition and language. Ex. M at 5. Emotionally, his "relatedness and connection to others is problematic" and "[h]e requires close adult supervision as his ability to moderate his frustration tolerance is weak." *Id.* From 2006 through 2015, B.G. attended the Rebecca School, a private

school for children with disabilities, and, with the exception of the 2012–2013 academic year in dispute, the DOE has funded his tuition. Tr. 157:18–23.[1]

## II. The CSE Meeting and the Student's IEP

### A. CSE Meeting and IEP

On June 12, 2012, the CSE convened to develop B.G.'s IEP for the 2012–2013 school year. The CSE participants were: (1) Dr. Craig Czarnecki, the district representative and a school psychologist; (2) Lindsay Dakin, a DOE special education teacher; (3) Michelina Leone-Flick, a DOE social worker; (4) Carmen Garcia, a parent member; (5) Bonnie Waring, a Rebecca School social worker; (6) Marguerite Cohn, B.G.'s 2011–2012 special education teacher at the Rebecca School; and (7) E.P., B.G.'s mother. Ex. L at 19. The materials the CSE reviewed included a December 2010 classroom observation, Ex. 3, a January 2011 psychoeducational evaluation, Ex. 4, and two Rebecca School interdisciplinary progress reports dated December 2011 and June 2012, Exs. 5, 6.

In the IEP, the evaluation results indicate that B.G. "obtained a nonverbal IQ composite score of 74 on the [Stanford Binet Intelligence Scales,] which fell within borderline range" and "[h]is verbal IQ composite score of 69 fell within the upper end of the mildly delayed range." Ex. 8 at 1. The IEP recommends that B.G. be placed in a special education class comprised of six students, one teacher, and one paraprofessional aide, *i.e.*, a 6:1:1 class. *Id.* at 10. The IEP also recommends that B.G. participate in four sessions of speech-language therapy per week, twice individually and twice in a group of three; two sessions of physical therapy per week, once individually and once in a group of two; four sessions of occupational therapy per week, three

[1] Citations to the Transcript or "Tr." are to the impartial hearing transcript.

individually and once in a group of three; and two counseling sessions per week, once individually and once in a group of two. *Id.*

In the section documenting B.G.'s present levels of social development, the IEP notes that he "is able to engage in good back and forth with [peers and adults]," but he "does not initiate these conversations." *Id.* at 1. It also states that he "struggles with initiations, transitions, and pretend play," and that he "is a very emotional child and requires a large amount of support." *Id.* With respect to physical development, the IEP provides that B.G. "struggles with his fine motor skills such as manipulating small buttons," and that E.P. expressed that, "it is important to him to have teachers and therapists that understand him and his sensory/fine motor needs in order for him to work to the best of his ability." *Id.* at 2. His management needs section lists "visual and verbal prompts," "sensory breaks," "use of calm effect" and "time to process" as management tools. *Id.*

The IEP includes annual goals related, *inter alia*, to the management of B.G.'s sensory needs and verbal deficits, accompanied by short-term objectives and benchmarks to measure B.G.'s achievements in these areas. With respect to his sensory needs, the goals include improvement of his motor planning, his visual-spatial and perceptual skills, his sensory processing and body awareness, and his balance, coordination, and visual-spatial processing. *Id.* at 5–7. As to his verbal development, the IEP includes goals to increase his ability to initiate interactions with adults and peers, improve his engagement and pragmatic language skills to increase his ability to participate in a continuous flow of communication, improve his expressive language skills to increase his communicative effectiveness, and increase his flexibility and spontaneity in sessions with his therapist. *Id.* at 7–8.

**B. The Placement Site**

On June 21, 2012, the DOE sent B.G. a Final Notice of Recommendation ("FNR"), which placed B.G. in a 6:1:1 class at P138M at 47 (the "Placement School"). Ex. 10. E.P. testified that she first attempted to contact the Placement School by phone, but was unable to do so because the contact number listed on the FNR was incorrect. Tr. 162:22–163:2. She made multiple other attempts to contact the school, but was unable to reach anyone. *Id.* at 163:7–10. On June 26, 2012, she attempted to visit the school in person. *Id.* at 163:21–22. When she arrived, E.P. met the school's unit coordinator who agreed to give her a tour. *Id.* at 164:6–10. She testified that, during the tour, she saw the floor where B.G. would have been placed, and observed children in a 6:1:1 class engaged in a game that she described as "some type of Olympics," which involved running up and down the hallway. *Id.* at 164:16–21. E.P. asked the unit coordinator about the children in the 6:1:1 class, and, according to E.P.'s testimony, the unit coordinator described three of the children as non-verbal and using devices to communicate, and "the other ones [as] minimum [sic] verbal." *Id.* at 164:21–165:5. E.P. also testified that she told the unit coordinator "how high functioning" B.G. was, and E.P.'s impression was that the coordinator was "impressed." *Id.* at 165:5–13. When E.P. asked a number of other questions about the schedule and whether the younger children interacted with the older ones, the coordinator "wasn't really clear about it" and told her "every day is a different day." *Id.* at 166:8–23.

On June 27, 2012, following this first visit, the New York Legal Assistance Group ("NYLAG") sent a letter on behalf of E.P. to the Chairperson of the CSE asserting that DOE had failed to offer B.G. an appropriate placement for 2012–2013. Ex. K at 1. The June 27, 2012 letter relayed E.P.'s experience while visiting the Placement School, stating that she had "observed students from the 6:1:1 classroom running up and down a hallway with students from a high

school-aged 12:1:1 class." *Id.* The letter also indicated that, based on the unit coordinator's description of three of the six students as "non-verbal" and three as "minimally verbal," the current students in the 6:1:1 class exhibited "far lower levels of functioning than [B.G.]." *Id.* Finally, the letter noted that "[n]o specific teaching methodology is used in the classroom." *Id.* The letter thus informed the DOE that "[p]ending the receipt of another more appropriate placement," E.P. "plans to enroll [B.G.] in the Rebecca School for the 2012-2013 school year, and will seek tuition payment by the DOE." *Id.* E.P. received no response to this letter. Ex. A at 3.

After sending this letter, E.P. continued to try to contact the Placement School, this time with a number she had received during her visit. Tr. 164:5–6. She testified that she attempted twice more to reach the assistant principal, but her messages were not returned. *Id.* at 167:19–22; *see also* Ex. I at 1. She returned to the school on July 11, 2012, accompanied by Ms. Waring, a Rebecca School social worker. Tr. 167:21–22; *Id.* at 76:4–19; Ex. I at 1. This time, the unit coordinator informed E.P. that she could not show her the classroom, and advised her that she would have to see the assistant principal, who was not available at that time. Tr. 168:9–16.

On July 13, 2012, NYLAG sent another letter to the CSE "confirm[ing] that the [DOE] had failed to offer [B.G.] an appropriate placement for the 2012-2013 school year." Ex. I at 1. The letter recounted E.P.'s two subsequent attempts to contact the school by phone, and her second visit to the school when she had been unable to view a classroom. *Id.* The letter reiterated E.P.'s intention to send B.G. to the Rebecca School and seek tuition reimbursement. *Id.* at 2. E.P. did not receive a response from the DOE. Ex. A at 3. On July 24, 2012, E.P. enrolled B.G. in the Rebecca School for the 2012–2013 academic year. Ex. H.

### C. Due Process Complaint

On August 1, 2013, E.P. filed a due process complaint seeking reimbursement for the 2012–2013 and 2013–2014 academic years. Ex. A. The parties subsequently settled E.P.'s claims for the 2013–2014 year. The current appeal is thus limited to the 2012–2013 academic year. Tr. 189:10–15.

The due process complaint identified five challenges to the 2012–2013 IEP relevant to the current motions.[2] First, E.P. alleged that "the IEP does not discuss the importance of peer grouping," despite the Rebecca School's emphasis on its importance to B.G.'s ability to progress. Ex. A at 2. Second, the complaint asserted that the school placement was not appropriate. E.P., for example, "observed children in the 6:1:1 class running up and down the hallway with high-school aged students from a 12:1:1 class" and was informed during her tour of the school that the students in the 6:1:1 class were lower functioning than B.G. *Id.* Third, the complaint recounted E.P.'s difficulties contacting the placement school's administration, and that she was ultimately unable to visit the actual classroom. *Id.* Fourth, the complaint stated that, although the "Physical Development" section of the IEP "mentions the importance of understanding [B.G.'s] sensory/fine motor needs, [it] does not discuss what they are." *Id.* Fifth, the complaint asserted that the IEP did not provide for parent counseling or training. *Id.*

### D. IHO Hearing and Decision

An impartial hearing was held over four non-consecutive days from December 2013 to April 2014.[3] There were seven witnesses: (1) Dr. Craig Czarnecki, the DOE representative who chaired B.G.'s CSE meeting; (2) Marguerite Cohn, B.G.'s 2011–2012 teacher at the Rebecca

---

[2] The due process complaint also alleged that the IEP did not provide an adequate description of the tests administered in the psychoevaluation, but Plaintiffs appear to have abandoned this claim. *Compare* Ex. A at 2, *with* Pl.'s Mem.

[3] The IHO also held two prehearing conferences on September 27, 2013 and November 5, 2013.

School; (3) Bonnie Waring, B.G.'s 2011–2012 social worker at the Rebecca School; (4) Tina McCourt, the Director of the Rebecca School; (5) Ali Regan, B.G.'s 2012–2013 occupational therapist at the Rebecca School; (6) Rachel Leeper, the Educational Supervisor of B.G.'s 2012–2013 Rebecca School class; and (7) E.P., B.G.'s mother. IHO Dec. at 1–2.

On June 2, 2014, IHO Michael Lazan issued his decision, which concluded that the DOE had failed to provide B.G. with a FAPE. Specifically, the IHO found that (1) the IEP neglected to include information on the appropriate functional grouping for B.G.; (2) the IEP contained insufficient information on B.G.'s sensory needs; (3) E.P., as B.G.'s parent, was "inappropriately thwarted in her efforts to view the school"; and (4) the IEP did not include a parental counseling provision, "compounding the problems with the program and placement." IHO Dec. 6–8. The IHO also found that E.P. had carried her burden of showing that the Rebecca School was an appropriate placement and that equitable considerations favored reimbursement. *Id.* at 8–10. The IHO thus concluded that she was entitled to reimbursement. *Id.* at 10–11. The DOE appealed the IHO's Decision to the Office of State Review. Def.'s Verified Pet., July 7, 2014.

**E. SRO Decision**

On September 30, 2014, the SRO, Carol H. Hague, issued a decision, reversing the decision of the IHO. SRO Dec. 1. First, the SRO rejected the IHO's finding that the IEP's omission of information regarding B.G.'s functional grouping denied him a FAPE. Listing the various state regulations that govern the determination of a student's functional grouping, the SRO concluded "that there is no legal requirement to specify functional grouping in an IEP." *Id.* 17. The SRO also found that the IEP "accurately described . . . the student's sensory and fine motor needs—and that the description of B.G.'s sensory needs was consistent with the evaluative information available in the June 2012 CSE." *Id.* at 12. With respect to parental counseling and training,

although the SRO acknowledged that its omission violated state regulations, she nevertheless concluded that it did not deny B.G. a FAPE. *Id.* at 13. The SRO also rejected E.P.'s claims that the classroom placement was inappropriate, finding that E.P.'s challenge to the implementation of the IEP was speculative because she and B.G. did not avail themselves of the proposed placement, and that, even if such speculative challenges were permissible, there was no basis to conclude that the DOE would have "deviated from the student's IEP." *Id.* at 14–16. Lastly, the SRO disagreed with the IHO's determination that E.P. was denied an opportunity to offer input on the placement. *Id.* at 15.

## DISCUSSION

### I. Standard of Review

"Although the parties have styled their submissions as motions for summary judgment, 'the procedure is in substance an appeal from an administrative determination, not a summary judgment.'" *C.U. v. New York City Dep't of Educ.*, 23 F. Supp. 3d 210, 222 (S.D.N.Y. 2014) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)); *see also L.O.*, 2016 WL 2942301, at *6 ("Summary judgment in this context involves more than looking into disputed issues of fact; rather it a 'pragmatic procedural mechanism' for reviewing administrative decisions.") (quoting *R.E.*, 694 F.3d at 184). "In considering an IDEA claim, a district court 'must engage in an independent review of the administrative record and make a determination based on the preponderance of the evidence.'" *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837–38 (2d Cir. 2014) (quoting *Gagliardo,* 489 F.3d at 112). "The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *Gagliardo,* 489 F.3d at 112 (internal quotation marks omitted). "[T]he Supreme Court has cautioned that such review 'is by no means an invitation of the courts to substitute their own

notions of sound educational policy for those of the school authority which they review.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2009) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982)). "This review requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *L.O.*, 2016 WL 2942301, at *6 (internal quotations omitted) (quoting *M.W.*, 725 F.3d at 138).

In the course of undertaking this review, the district court "must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.O.*, 793 F.3d at 243 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)). "The deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F.*, 746 F.3d at 77 (citing *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012)). "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *Id.* at 77 n.7 (quoting *M.H.*, 685 F.3d at 244). "Where the IHO and SRO disagree, we defer to the reasoned conclusions of the SRO as the final state administrative determination. However, where the SRO's determinations are insufficiently reasoned to merit deference, the courts should defer to the IHO's analysis." *Id.* at 77 (quoting *M.H.*, 685 F.3d at 246, 252) (internal citations, quotations, and alterations omitted); *see also R.E.*, 694 F.3d at 189.

## II. Prong 1: E.P.'s Challenges

The Court thus turns to the first prong of the *Burlington/Carter* Test, which requires it to consider whether the DOE's proposed plan provides B.G. with a FAPE. Plaintiff makes the following challenges to the IEP and placement, which mirror those she made in the administrative

proceedings below. First, E.P. argues that DOE denied B.G. an adequate education by failing to specify in the IEP that B.G. requires verbal peers. Second, she argues that the placement itself was deficient because the DOE failed to place B.G. in a class with verbal peers. Third, she asserts that the DOE violated her procedural rights to evaluate the placement by impeding her ability to determine if B.G. was placed with verbal peers. Fourth, E.P. argues that the DOE failed to offer B.G. necessary sensory interventions, without which, he would have regressed. And fifth, E.P. argues that the DOE failed to provide her the state-mandated parent counseling and training, which exacerbates the other failures. The Court will address each of these claims in turn.

**A. Verbal Peers in the IEP**

E.P. first challenges the IEP itself, arguing that, in light of the testimony during the CSE meeting that verbal peers were "incredibly important" to B.G.'s social, emotional, developmental, and academic progress, Tr. 91:1–3, the DOE denied B.G. a FAPE by failing to require that he be placed with such peers. Pl.'s Mem. 11–17. E.P. further contends that, because the SRO did not consider this claim, her opinion is not entitled to deference. *Id.*

The SRO, however, did address this claim. She held that, contrary to the IHO's determination, "there is no legal requirement to specify functional grouping in an IEP." SRO Dec. 17. The SRO instead concluded that state regulations, which require the DOE in the course of implementing the IEP to place a student with other students with similar needs, were designed to ensure that a student be placed in the appropriate functional group. *Id.*

While the Court does not go so far as to hold that an IEP need not ever specify functional grouping, the Court agrees with the SRO's conclusion that the IEP's failure to specify that B.G. be placed with peers of certain verbal ability did not render the IEP substantively deficient. *See M.P.G. ex rel. J.P. v. New York City Dep't of Educ.*, No. 08-CV-8051 (TPG), 2010 WL 3398256,

at *11 (S.D.N.Y. Aug. 27, 2010) (functional grouping is a question of education policy for which courts should give due weight to the administrative proceedings). As noted by the SRO, New York State regulations are designed to ensure that students with disabilities are suitably grouped, requiring that such students be placed with students who have similar levels of academic achievement, social and physical development, and management needs. 8 NYCRR § 200.6(h)(2); *see also Id.* § 200.1(ww)(3)(i); *J.F. v. New York City Dep't of Educ.*, No. 12-CV-2184 (KBF), 2013 WL 1803983, at *2 (S.D.N.Y. April 24, 2013) ("New York state regulations implementing the IDEA clearly constrain a school district's choice of placement classroom."). One state regulation expressly requires that, when the DOE implements a student's IEP, "[t]he social development of each student shall be considered prior to placement in any instructional group to assure that the social interaction with the group is beneficial to each student, contributes to each student's social growth and maturity, and does not consistently interfere with the instruction provided." 8 NYCRR § 200.6(a)(3)(ii). The regulation adds, however, that "[t]he social needs of a student shall not be the sole determinant of such a placement." *Id.* Courts have accordingly understood that "[u]niformity of needs . . . is not required." *E.A.M. v. New York City Dep't of Educ.*, No. 11-CV-3730 (LAP), 2012 WL 4571794, at *10 (S.D.N.Y. Sept. 29, 2012) (citing *Walczak*, 142 F.3d at 133).

The IEP contains a sufficient description of B.G.'s verbal ability and needs to allow the DOE to determine the appropriate functional grouping. In the section that describes B.G.'s present levels of social development, the IEP states, "[w]hen peers or adults initiate with [B.G.,] he is able to engage in a good back in forth with them. However, [B.G.] does not initiate these conversations, but he is very willing to engage around his preferred topics when they are brought up by others." Ex. 8 at 1. The IEP also notes that he "struggles with initiations." *Id.* The section on his social

strengths further recounts that, "[B.G.'s] best interactions revolve around talking about topics of current events. [He] is very curious about stories he sees in the news and will ask questions to get a better understanding of what he heard in the report." *Id.* at 2.

The IEP also includes a number of goals that are aimed at encouraging B.G.'s social development and specifically addresses his difficulties with initiation. For example, one of the IEP's annual goals is that "[w]ithin one year, with guidance and support, [B.G.] will increase his ability to initiate interactions with both adults and peers." *Id.* at 3. Another goal is that "[f]or speech-language therapy, within one year, with guidance and support, [B.G.] will improve his engagement/pragmatic language skills to increase his ability to participate in a continuous flow of communication." *Id.* at 7. The corresponding short-term objectives include the following: "[d]uring a conversational exchange with an adult, [B.G.] will maintain a logical and continuous flow of communication, across a range of themes and feelings consisting of 40 to 50 circles given minimal redirection to maintain topic"; and "[B.G.] will independently sustain a reciprocal verbal interaction with a peer for 10 to 15 circles of communication." *Id.* A third annual goal is that "[f]or counseling services, within one year, with guidance and support, [B.G.] will increase flexibility and spontaneity in sessions with the therapist." *Id.* at 8. A corresponding objective is that B.G. make "3 spontaneous comments to initiate or extend an interaction during at least 5 sessions in the next review period." *Id.* at 8. The IEP thus contains sufficient detail about B.G.'s social functioning and deficits to allow for the DOE to assess the appropriate functional grouping consistent with the requirements of the regulations detailed above.

In any event, "the social needs of [a student] cannot be the sole factor in determining his placement [where] the similarities in academic and cognitive needs" also need to be taken into account. *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 436 (S.D.N.Y.

2010) *aff'd*, 487 F. App'x 619 (2d Cir. 2012). The DOE is thus correct that "the educational benefits flowing from an IEP must be determined from the combination of offerings rather than the single components viewed apart from a whole." *Karl v. Bd. of Educ. of Genesco Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984). Here, the IEP recommends that B.G. be placed in a 6:1:1 class, a class designed for students with highly intensive management needs. Ex. 8 at 10. E.P. does not challenge the appropriateness of the classroom ratio, but instead argues that the *sine qua non* of a FAPE for B.G. is peers of similar verbal ability. While addressing B.G.'s social needs is undoubtedly an important aspect of his education, *see* Tr. 51:15–23; Tr. 73:20–25; Tr. 120:12–13, IDEA does not require that the "social arrangement of the Placement Classroom [be] ideal for the [s]tudent." *E.A.M.*, 2012 WL 4571794, at *12; *see also H.C. v. New York City Dep't. of Educ.*, No. 14-CV-1927 (AKH), 2015 WL 1782742, at *4 (S.D.N.Y. Apr. 10, 2015) ("DOE is permitted to group students with different needs unless the grouping detracts from the opportunities of other students."). Rather, the placement need only be "likely to produce progress, not regression" and provide the student with the opportunity for more than "trivial advancement." *Walczak*, 142 F.3d at 130.

The IEP satisfies this standard in that it accurately reflects B.G.'s social ability with sufficient specificity to allow the DOE to comply with the state regulations designed "to assure that the social interaction within the group is beneficial to each student, contributes to each student's social growth and maturity, and does not consistently interfere with the instruction being provided." 8 NYCRR § 200.6(a)(3)(ii). The Court thus finds, consistent with the SRO's conclusion, that the IEP is "reasonably calculated to enable the child to receive educational benefits." *C.F.*, 746 F.3d at 72.

**B. Placement School**

E.P. challenges the Placement School on the same grounds that she challenges the IEP: that B.G.'s prospective classmates were less verbal than he. Ex. A at 2.[4] E.P. also argues that the placement was inappropriate because children in the 6:1:1 class were running up and down the hallways with the 12:1:1 class. *Id.* The SRO concluded that E.P. "cannot prevail on the claims regarding implementation of the June 2012 IEP because a retrospective analysis of how the district would have implemented the student's June 2012 IEP at the assigned public site is not an appropriate inquiry" given that E.P. rejected the placement and unilaterally enrolled B.G. at a nonpublic school. SRO Dec. 15.

The Second Circuit's recent opinion in *M.O. v. New York City Department of Education*, 793 F.3d 236 (2d Cir. 2015), which was issued after the SRO's decision, makes clear that the SRO erred in her conclusion that there are no circumstances in which parents may challenge a proposed school their child did not attend.[5] In particular, *M.O.* held that not "*all* prospective challenges to a child's proposed placement" are foreclosed. 793 F.3d at 244 (emphasis in original). Moreover, the SRO's alternate conclusion that, even assuming that a parent could make a prospective challenge, "the evidence in the hearing record does not support the conclusion that the district would have violated the FAPE legal standard related to IEP implementation," SRO Dec. 16, is "too cursory to merit deference." *F.B. and E.B. v. New York City Dep't of Educ.*, 132 F. Supp. 3d 522, 550 (S.D.N.Y. 2015).

---

[4] Although Plaintiffs did not separately address the proposed placement in their motion, their due process complaint challenges the placement itself "given the lack of organization and that [B.G.'s] prospective peers were lower functioning." Ex. A at 2; *see also* Tr. 23:20–21 ("[N]ot just the IEP, the placement as well").

[5] As the SRO correctly noted, however—before the Second Circuit clarified the issue—district courts were divided on whether a parent could prospectively challenge a school placement. *See, e.g., S.W. v. New York Dep't of Educ.*, 92 F. Supp. 3d 143, 162 (S.D.N.Y. 2015) ("Some courts have read *R.E.* broadly enough to exclude all prospective challenges to a child's proposed placement.").

The IHO's opinion is no more instructive, as it did not address the challenge to the placement site, instead finding that the IEP was itself deficient, a conclusion this Court has rejected. IHO Dec. 7. The Court must therefore determine *de novo* whether E.P.'s challenge to the placement is a permissible objection. *See Q.W.H. v. New York City Dep't of Educ.*, No. 15-CV-1876 (VEC), 2016 WL 916422, at *9 (S.D.N.Y. Mar. 7, 2016) (reviewing whether plaintiffs "presented permissible prospective objections to the placement" *de novo* where the IHO and SRO applied the incorrect standard).

According to *M.O.*, a parent is permitted to challenge a placement on the basis that "it lacks the services required by the IEP," *M.O.*, 793 F.3d at 244. *M.O.* cites two examples of such permissible, nonspeculative challenges:

> [I]t is not speculative to conclude that an IEP recommending a seafood-free environment, for a child with a life threatening seafood allergy, could not be implemented at a proposed school that was not seafood free. Nor is it speculative to conclude that an IEP recommending one-on-one occupational therapy, outside of the classroom, could not be implemented at a school that provided only in-class occupational therapy in a group setting.

*Id.* (internal citations omitted). An impermissible challenge, by contrast, is one that merely argues that "the written IEP would not have been effectively implemented at the [proposed placement school]." *Id.* (quoting *R.E.*, 694 F.3d at 195). In *M.O.*, for example, the Circuit held that challenges "on the grounds that the school building was too large, the student-teacher ratio was too large, and the language-based program was inappropriate" were impermissible challenges because "they relate to the appropriateness of the IEP's substantive recommendations," and were thus really substantive attacks to the IEP framed as challenges to the placement. *Id.* at 245. The case of *R.E.* presented another example of an impermissible challenge to the placement school. In that case, the Circuit concluded that the parent's claim that the placement school would "underserve" the student in the provision of occupational therapy was inappropriate "[s]peculation that the school

district will not adequately adhere to the IEP." *R.E.*, 694 F.3d at 195; *see also M.T. v. New York City Dep't of Educ.* No. 14-CV-10124 (GHW), 2016 WL 1267794, at *11 (S.D.N.Y. March 29, 2016) ("The [*M.O.* panel], thus, recognized that the framework established in *R.E.* survived *M.O.*—that many, most, in any event something less than *all*, challenges to the capacity of the placement school are appropriately deferred to 'a later proceeding to show that the child was denied a FAPE because the necessary services were not provided in practice . . . .'") (quoting *R.E.*, 694 F.3d at 187 n.3).

E.P's challenges to the proposed placement—that B.G.'s prospective peers were not as verbally advanced as he and that the school environment was disorganized—fall squarely within the category of impermissible challenges. E.P.'s claim that B.G.'s prospective peers were less advanced than he is based on a presumption that the DOE would fail to comply with the regulations that required that B.G. be placed with students of similar academic, social, physical, and developmental needs. *See Q.W.H.*, 2016 WL 916422, at *10 (objection that the academic range of students in placement class "was too wide and too advanced" was "an impermissible prospective challenge").

E.P. counters that the objection is based on information learned from the school coordinator, and is thus not speculative. Specifically, she testified that the unit coordinator told her that the current 6:1:1 class at the Placement School is comprised of three students who are nonverbal and three who are minimally verbal. Tr. 165:1–5. E.P. also testified that she described B.G. to the unit coordinator, explaining "how high function[ing] he is" and "the things he was able to do," and that the unit coordinator was "very impressed." *Id.* at 165:5–9.

While the Court is sympathetic to E.P.'s concerns about her son's placement classroom, there is insufficient evidence in the record to raise E.P.'s concerns above a speculative level.

Plaintiff's only evidence regarding the verbal functioning of the members of E.P.'s prospective classroom is her account of the unit coordinator's characterization of the students. E.P.'s complaint also assumes that the class would have had the same students in it when B.G. joined it. But assuming that there were six students in the class when E.P. visited the Placement School, this could not be the case, because otherwise B.G. could not have join the class (as it then would have contained seven students, exceeding the IEP mandated 6:1:1 ratio). *See M.T.*, 2016 WL 1267794, at *13 (holding that challenge based on class composition was speculative because it "may change depending on fluctuations in enrollment, and on other parents of students with IEPs who are making their own placement decisions").

Nor can the Court conclude, based on the fact that E.P. understood the unit coordinator to be "impressed" with B.G. that his verbal skills were far more advanced than those of his prospective peers. To reach such a conclusion would require the Court to deduce that the unit coordinator's remarks about B.G. were based on a comparison of B.G. to the students in the 6:1:1 classroom. E.P.'s account of the unit coordinator's laudatory remarks, and the deductions that E.P. urges, *see* Pl.'s Mem. 15 (the unit coordinator's reaction "clearly indicat[ed] that none of the students were nearly as verbal as B.G."), are not the objective evidence on which the Court is permitted to rely. *See Walczak*, 142 F.3d at 130 (Courts must "examine the record for any 'objective evidence' indicating whether the child was likely to make progress or regress under the proposed plan."); *see also, e.g.*, *J.D. on behalf of A.P. v. New York City Dep't of Educ.*, No. 14-CV-9424 (ER), 2015 WL 7288647, at *16 (S.D.N.Y. Nov. 17, 2015) ("Plaintiff's own testimony that MS 326 officials made comments to her indicating an inability to effectively serve [the student] do not come close to proving that the school was 'factually incapable' of implementing the IEP, and was thus properly excluded from consideration by the SRO.") (quoting *K.C. ex re.*

*CR v. New York City Dep't of Educ.*, No. 14-CV-836 (RJS), 2015 WL 1808602, at *12 (S.D.N.Y. Apr. 9, 2015)).

Plaintiff's second challenge, that the school is disorganized because the 6:1:1 class improperly interacts with the older 12:1:1 class, is also speculative and "as such is not an appropriate basis for unilateral placement." *R.E.*, 694 F.3d at 195; *see also Y.F. v. New York City Dep't of Educ.*, No. 15-CV-6322 (LGS), 2015 WL 4622500, at *7 (S.D.N.Y. July 31, 2015) (holding plaintiffs' challenges regarding the size, curriculum, and environment of the placement merely speculate that the school will fail to adhere to the IEP). Both of E.P.'s challenges to the placement thus fail.

**C. Procedural Right to Evaluate the Placement School**

E.P.'s next challenge is procedural. E.P. argues that the DOE violated her procedural right to participate in the placement decision by impeding her ability to determine whether B.G. was placed "with verbal classmates with whom he could interact and communicate." Pl.'s Mem. 15. The SRO concluded, contrary to E.P.'s claim, that the DOE had not "inappropriately thwarted" her efforts to visit the Placement School, reasoning that IDEA gives parents a right to *evaluate* the school, not to *visit* it. SRO Dec. 15. The SRO therefore concluded that the IHO had misconstrued the standard. While the Court agrees that the IHO erred in framing the Parent's procedural right as a right to visit the placement, as opposed to a right to evaluate it, the SRO's own analysis was incomplete: having rejected the IHO's logic, the SRO failed to go on to consider whether E.P. was in fact able to evaluate the educational placement. The Court thus declines to defer to her conclusion and will consider the issue *de novo*. Such a review is particularly appropriate here where "the relevant facts are not disputed; and the issue at hand does not call upon education expertise, but instead is a straightforward one of the proper procedure[,] which courts are well-

equipped to address." *F.B. and E.B.*, 132 F. Supp. 3d at 541.

"The IDEA requires school districts to 'ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child.'" *C.F.*, 746 F.3d at 79 (quoting 29 U.S.C. § 1414(e)) (emphasis omitted). The Second Circuit has "interpreted the term 'educational placement' to refer to the general education program—such as the classes, individualized attention and additional services a child will receive—rather than the bricks and mortar of the specific school." *Id.* (quoting *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009)). In *C.F. v. New York City Department of Education*, for example, the Second Circuit held that a placement school's repeated failures to return a parent's calls and letters did not constitute a denial of a FAPE because "these difficulties [contacting the school] did not change the type of placement and therefore do not violate the procedures of the IDEA." *Id.* Courts have accordingly held that failure to specify a school site "does not 'constitute a *per se* violation of the IDEA,'" *id.*, and that parents have no right to visit a proposed school or classroom before the recommendation is finalized or prior to the school year." *S.F. v. New York City Dep't of Educ.*, No. 11-CV-870 (DLC), 2011 WL 5419847, at *12 (S.D.N.Y. Nov. 9, 2011).

Here, despite the Placement School's failure to respond to E.P.'s inquiries, she was not deprived of her right to participate in B.G.'s educational placement. E.P. attended and participated in the CSE meeting. Her concerns are reflected in the IEP. She was timely notified of the Placement School. She visited and was given a tour of the school. As a concerned and conscientious parent, E.P. was understandably frustrated by the Placement School's and DOE's failure to respond to her letters and phone calls. The Court is also troubled, and further recognizes that she was afforded a tour only because she took the initiative to visit the school. Nonetheless,

under existing law, the Court cannot conclude that B.G. was denied a FAPE because the information that E.P. was denied—information regarding "the students of the 6:1:1 classroom at P138M," and specifically, their level of verbal functioning, Pl.'s Mem. 15—was not information to which she was entitled. *See N.K. v. New York City Dep't of Educ.*, 961 F. Supp. 2d 577, 590 (S.D.N.Y. 2013) ("the DOE bears the burden of proving the appropriateness of the proposed IEP" and not the particular class's grouping); *Cerra*, 427 F.3d at 194 ("The District [ ] was not obligated to provide student profiles for [the student's] special education classes."); *S.F.*, 2011 WL 5419847, at *12 ("[T]he right of parents to participate in the meetings concerning their child's educational placement does not include the right to pick a particular classroom or school."). It thus cannot be said that E.P.'s inability to learn the identity and verbal ability of B.G.'s prospective peers "impeded the child's right to FAPE," "significantly impeded [her] opportunity to participate in the decisionmaking process regarding the provision of [FAPE] to [her] child," or "caused a deprivation of education benefits." *M.H.*, 685 F.3d at 245 (alterations omitted).

This holding is consistent with the Second Circuit's decision in *M.O.* As discussed above, *M.O.* distinguishes between permissible attacks on a placement school that challenge a school on the grounds that it "lacks the services required by the IEP," and impermissible challenges that speculate that "a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates." 793 F.3d at 244. While the *M.O.* court addressed challenges to the substantive adequacy of a placement, implicit in its holding is a recognition of certain procedural rights that are necessary to effectuate those substantive rights. As Judge Englemayer concluded in *F.B. and E.B.*: "The substantive right recognized by the Second Circuit in *M.O.* would be of little value if parents did not have the right to obtain relevant information in time to assess the placement and, if merited, to challenge it." 132 F. Supp. 3d at 541. The converse, however,

is also true: where a parent's challenge to the placement is an impermissible, speculative challenge, it follows that parents cannot raise a valid procedural challenge when they are denied access to such information. For example, if a parent objects to the student-teacher ratio in a placement school—which *M.O.* concluded constituted an impermissible challenge—a parent cannot raise a valid procedural challenge on the basis that he or she was denied access to information about such ratio. *See* 793 F.3d at 241, 245 (parent's challenges "did not trigger a duty on the part of the school district to provide evidence regarding [the placement school's] adequacy" because they "relate[ ] to the substantive adequacy of the [student's] IEP.").

It is this principle that distinguishes the instant case from *C.U. v. New York City Department of Education*, 23 F. Supp. 3d 210 (S.D.N.Y. 2014), cited by Plaintiffs. In *C.U.*, parents made a procedural challenge on the grounds that the placement school failed to respond to their repeated efforts to contact it, and, as a result, they were unable to ascertain whether the placement had certain IEP-mandated resources including a "quiet place to recover from seizures and a nurse on-site to administer the [the student's] medication." 23 F. Supp. 3d at 227. Judge Cote concluded this amounted to a denial of a FAPE because the parents were denied their "right to inquire whether the proposed school location had the resources set forth in the IEP," thus impeding the parents' ability to determine "crucial issues going to the substantive adequacy of the FAPE." *Id.*; *see also id.* at 229 ("when the identity of the school and its resources are relevant to the FAPE determination, parents have a procedural right to evaluate the school to assess whether it can be reasonably expected to satisfy the child's IEP").[6] *C.U.* is thus consistent with *M.O.*: because the

---

[6] *F.B. and E.B v. New York City Department of Education*, 132 F. Supp. 3d 522 (S.D.N.Y. 2015), is distinguishable for the same reason. There, Judge Engelmayer held that parents who attempted to contact the placement school four times and twice attempted to visit were denied "the right to obtain relevant and timely information as to the proposed school." 132 F. Supp. 3d at 545. Like *C.U.*, this holding turned on the nature of the information the parents sought. The parents in *F.B. and E.B.* were unable to determine whether the school had sensory materials and the teachers with training required by the IEP; thus, "the information the [p]arents sought was directly

parents would have been able to challenge the placement on the grounds that it did not have a quiet place or an on-site nurse, it follows that they were able to make a procedural challenge because they were unable to obtain information about whether the placement had these resources.

Here, the Court has determined that E.P.'s challenge to the Placement School on the basis that B.G. was not placed with verbal peers was an impermissible, speculative challenge. It follows that the DOE did not have a duty to provide E.P. with information about the verbal functioning of B.G.'s prospective peers. *See M.O.*, 793 F.3d at 244–45. Thus, without condoning the conduct of the Placement School and the DOE, the Court finds that their failure to provide E.P. this information does not constitute a denial of a FAPE.

**D. Sensory Interventions**

E.P. next challenges the IEP on the basis that it did not offer B.G. the necessary sensory interventions, thereby denying him a FAPE. The SRO rejected this claim, finding that the IEP accurately described and made appropriate recommendations to address B.G.'s sensory and fine motor needs. SRO Dec. 12. E.P. argues that the SRO does not merit deference as she "failed to consider B.G.'s need for a sensory diet." Pl.'s Mem. 21.[7] The Court disagrees. In reaching its conclusion, the SRO conducted a thorough review of the evidence considered at the CSE meeting and the testimony presented at the impartial hearing regarding B.G.'s sensory needs. SRO Dec. 9–12. The SRO concluded that the "IEP includes strategies to address the student's management needs, including the use of visual and verbal prompts, redirection, sensory breaks, the use of calm affect, and time to process." SRO Dec. 11 (internal citation omitted). The SRO also observed that

---

relevant to their ability to assess the proposed placement and its capacity to implement [the student's] IEP." *Id.* at 543.

[7] According to B.G.'s occupational therapist at Rebecca, a sensory diet is "an activity plan that's comprised of specific sensory inputs that provide the child with the sensory experiences they need in order to attain and maintain self regulation." Tr. 129:7–12.

the annual goals and short-term objectives for occupational and physical therapy included goals aimed at addressing B.G.'s sensory needs, and mirror the goals recommended by the Rebecca School. *Id.* "The sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003); *see also R.E.*, 694 F.3d at 189 (quoting *M.H.*, 685 F.3d at 244) ("Decisions involving a dispute over an appropriate education methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress."). The Court therefore defers to the SRO's well-reasoned analysis on this point.[8]

**E. Parent Counseling**

Lastly, E.P. argues that the omissions of parent counseling and training compounded the IEP's failure to provide appropriate sensory interventions. Although New York regulations require that the IEP provide for parent counseling and training, 8 NYCRR § 200.13(d), "the presence or absence of a parent-counseling provision does not necessarily have a direct effect on the substantive adequacy of a plan." *R.E.*, 694 F.3d at 191 (citing *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 811 (8th Cir. 2011)). "Moreover, because school districts are required by

[8] E.P.'s challenge also fails because it faults the IEP for neglecting to include the same sensory regimen that B.G. received at Rebecca. E.P., for example, argues that the IEP was deficient because it did not account for the fact that B.G. "needed a 'high arousal' sensory diet which consisted of the following sequence of activities: (1) active proprioceptive work such as jumping on a trampoline, riding a scooter, or doing an animal walk (*i.e.*, walking with hands and feet on the ground) to provide input to his muscles and joints; (2) vestibular movement using rotating platform to stimulate receptors in his semicircular canals; (3) organized eye exercises to strengthen eye muscles; and (4) more active proprioceptive work." Pl.'s Mem. 19–20. "[T]he appropriateness of a public school placement," however, "shall not be determined by comparison with a private school placement preferred by the parent." *M.H. v. New York City Dep't of Educ.*, No. 10-CV-1042 (RJH), 2011 WL 609880, at *11 (S.D.N.Y. Feb. 16, 2011) (quoting *M.B. v. Arlington Cent. Sch. Dist.*, No. 99-CV-9973 (SAS), 2002 WL 389151, at *9 (S.D.N.Y. Mar. 12, 2002)).

section 200.13(d) to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP." *Id.*; *see also M.W.*, 725 F.3d at 141–42.

The SRO's determination that the CSE's failure to recommend parental counseling and training alone does not constitute a denial of a FAPE merits deference. *See F.B. v. New York City Dep't of Educ.*, 923 F. Supp. 2d 570, 585 (S.D.N.Y. 2013) ("[W]hile a failure to provide parent counseling and training may—in combination with other deficiencies—*contribute* to denial of a FAPE, it alone is insufficient to rise to the level of denial thereof.) (internal citation omitted and emphasis in original).

## III. Prongs 2 and 3: The Private Placement and the Equities

Because B.G.'s 2012–2013 IEP was procedurally and substantively adequate, and the Court need not reach the final two prongs of the *Burlington/Carter* test.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied, and DOE's motion for summary judgment is granted. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 16 and 21, and to close the case.

SO ORDERED.

Dated: June 10, 2016
New York, New York

Ronnie Abrams
United States District Judge